IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ROBERT and DEBRA
GLIBOWSKI,

        **Plaintiffs,**

v.                                    **No. 09-CV-1039 MCA/KBM**

UNITED STATES OFFICE OF
PERSONNEL MANAGEMENT,

        **Defendant.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Plaintiffs' *Motion to Enforce the Court's December 9, 2013 Order.* [Doc. 45] The Court, having considered the parties' submissions and the relevant law, hereby **GRANTS-IN-PART** and **DENIES-IN-PART** Plaintiff's Motion.

## BACKGROUND

Plaintiffs filed their *Motion to Enforce the Court's December 9, 2013 Order* on October 9, 2015. [Doc. 45] At that time, OPM had still not yet issued its Final Decision with the proper analysis, which the Court ordered in December of 2013. [Docs. 23, 45, 46] Further, this was Plaintiffs' second Motion to Enforce. The first Motion to Enforce (which Plaintiffs called a "Motion to Reopen") was filed in January of 2015. [Doc. 39] In response to that Motion, OPM represented that it was in the process of complying with the Court's Order (without stating how long that process would take). [Doc. 41, pp. 4, 5] In considering Plaintiffs' First Motion to Enforce, the Court determined that OPM's nine-

month delay was unreasonable, but, given OPM's representation that it was processing the appeal, the Court denied the Motion without prejudice. [Doc. 43, p. 12] The Court's Order was issued on September 24, 2015.

Approximately 2 weeks later, Plaintiffs filed the present Motion. [Doc. 45] Thereafter, and three days before OPM filed its response, OPM issued its 2015 Final Agency Decision (2015 Final Decision) on October 23, 2015. [Doc. 46; Doc. 46-1] Thus, in OPM's Response to Plaintiff's Motion to Enforce, OPM argued that Plaintiffs' request to enforce the Court's prior Order was moot given that the Agency issued its 2015 Final Decision. [Doc. 46] Plaintiffs filed a Reply Brief, in which they argued that their Motion to Enforce was not moot because OPM's 2015 Final Decision still failed to explain the basis for its decision and determine whether each particular service was medically necessary as previously ordered by the Court. [Doc. 49, p. 2] The Court considers the parties' arguments below and sets out further facts as necessary to decide the issues presented.

**ANALYSIS**

**Preliminary Issues**

*CD-ROM*

As a preliminary matter, the Court must address the issue of a CD-ROM mailed to the Court by Plaintiffs' counsel. In Plaintiffs' Reply brief, Plaintiffs' counsel states:

> Since the favorable references on the CD-ROM supplied by OPM were
> <u>vastly</u> superior and more current than the scanty 10 articles cited by the
> "reviewer," Plaintiffs only sent citations to 40 more articles published in
> peer reviews, in the cover letter, relating directly to the medical necessity of

the testing and treatment of chronic, long-term Lyme disease, along with over 80 pages of disagreement with the math of the underlying insurer.

[Doc. 49, p. 3]  Throughout the rest of their Reply, Plaintiffs refer to the CD-ROM sent by OPM.  [Doc. 49, pp. 4, 7, 8, 10]  Plaintiffs' counsel also mailed a copy of the CD-ROM to the Court.  [Doc. 52]  OPM sought to file a Surreply, which the Court granted. [Doc. 51]  In its Surreply, OPM states that the CD-ROM did not originate from OPM. [Doc. 55, p. 1]  OPM attached an affidavit from Thys J. deYoung, an Insurance Contracting Officer employed by OPM who is responsible for the Glibowskis' case, stating that the CD-ROM "did not come from OPM and was not provided to Mr. L'Esperance as an enclosure to a letter sent to him by OPM on May 15, 2015." [Doc. 55-1, ¶ 3]  Mr. deYoung provides evidence establishing that the CD-ROM did not come from OPM.  Further, in OPM's brief, OPM's counsel stated that, "on December 31, 2015, during a conversation with undersigned counsel, Plaintiffs' counsel admitted that the CD was in fact prepared by his clients, that it was not sent to him by OPM on or about May 15, 2015, and that he never submitted the CD to OPM for consideration." [Doc. 55, p. 2] Plaintiffs' counsel never requested leave of the Court to respond to these statements by OPM.

The Court ordered OPM to submit the administrative record to the Court.  [Doc. 57] The Court reviewed the administrative record and the Court finds that the CD-ROM did not originate from OPM.  Plaintiffs' Counsel is admonished for the misrepresentations he made to the Court, whether inadvertent or not.

The Court will not consider the matter on the CD-ROM mailed to the Court. In reaching its decision, the Court relies only on the matters submitted to the Court on the docket and in the administrative record.

### Provider Rate

Plaintiffs argue that they should be reimbursed at the in-network provider rate. [Doc. 49, p. 5]  However, Plaintiffs' own evidence establishes that they knew as of September 21, 2006 that their insurer, the Mail Handlers Benefit Plan (MHBP) would pay claims to Dr. Ryser at an out-of-network provider rate.  Mr. Glibowski stated:

> I called MHBP on 9/21/06 and spoke to a MHBP representative to ask if they had any recommendation of a doctor to treat Debra's Lyme disease. The representative told me that the only person in Albuquerque was Dr. Ivan Pinion, an endocrinologist. Dr. Pinion told Debra that he had no knowledge of Lyme disease. I told the MHBP representative that Dr. Aaron Kaufman, Debra's in-network primary care doctor, had referred her to Dr. Carol Ann Ryser in Kansas City, MO. The representative said that MHBP would pay for Dr. Ryser as an out-of-network provider.

[AR 1]  In their *Complaint*, Plaintiffs state:

> In 2006 Mrs. Glibowski sought treatment for Lyme disease, was diagnosed to have Lyme disease, and was assured by Mail Handlers Benefit Plan representatives, on several occasions, that treatment by Dr. Carol Ann Ryser was covered, as an out-of-network provider, by contract for healthcare through this policy.

[Doc. 1, ¶ 7]  Plaintiffs did not argue that this rate was erroneous in either their *Complaint* [Doc. 1] or *Opening Brief* [Doc. 20, pp. 18-21].  Thus, Plaintiffs failed to preserve this argument and, accordingly, it is improper for the Court to now consider the argument on their *Motion to Enforce the Court's December 9, 2013 Order. C.f. Lyons v. Jefferson Bank & Trust,* 994 F.2d 716, 720-21 (10th Cir. 1993) (explaining preservation

generally); *Berna v. Chater*, 101 F.3d 631, 632-33 (10th Cir. 1996) (stating that the Court will only review arguments properly preserved in the district court). Accordingly, the Court determines that all benefits that it orders to be paid must be paid at the out-of-network provider rate.[1]

### Motion to Enforce - Standard of Review

OPM argues that Plaintiffs' Motion to Enforce is moot. [Doc. 46, p. 2; Doc. 55, p. 1] Though the procedural posture of this case changed after Plaintiffs filed their Motion to Enforce, the Court will address the arguments Plaintiffs raise in their Reply brief and address their Motion to Enforce the Court's Order. OPM is responsible for the change in procedural posture by issuing its 2015 Final Decision during briefing, and, accordingly, the Court will not hold that change in the procedural posture against Plaintiffs. OPM had the opportunity to respond to Plaintiffs' newly raised arguments in its Surreply, and, in fact, OPM did address the question of whether it complied with the Court's 2013 *Memorandum and Opinion Order* by collecting additional relevant medical evidence, allowing Plaintiffs the opportunity to rebut that evidence, and then articulating a rational connection between the facts found and OPM's 2015 Final Decision. [Doc. 55, pp. 4-8] Thus, the Court concludes that Plaintiffs' Motion to Enforce [Doc. 45] is properly before the Court.

---

[1] The Court also notes that Plaintiffs mention that they had sent "computations" to OPM, and Plaintiffs claim that there are additional errors in the amount of benefits paid by OPM. Plaintiffs did not, however, submit for the record, the evidence necessary to address this issue or make out an argument. [Doc. 49, p. 4] Accordingly, the Court cannot review this issue.

Pursuant to Federal Rule of Civil Procedure 70(a), the Court will address whether OPM's 2015 Final Decision complies with the Court's directives in its 2013 *Memorandum Opinion and Order* to make the evidence justifying its decision a part of the record and to articulate its basis for determining that Plaintiffs' tests and treatments were not consistent with standards of good medical practice.  [Doc. 49, p. 7; Doc. 23, pp. 50-101]  *See Analytical Eng'g, Inc. v. Baldwin Filters, Inc.*, 425 F.3d 443, 451 (7th Cir. 2005) (stating that, under Federal Rule of Civil Procedure 70, the Court may order a party to take a specific action in compliance with the court's prior order).

In determining whether, in compliance with the Court's 2013 *Memorandum Opinion and Order*, OPM developed a sufficient record and articulated a rational connection between the facts found and its decision, the Court again applies the arbitrary and capricious standard of review, set forth at length in its 2013 *Memorandum Opinion and Order*.  For clarity, the Court briefly restates the test it must apply.

> Under the arbitrary and capricious standard the scope of review is a narrow one. A reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency. The agency must articulate a rational connection between the facts found and the choice made. While we may not supply a reasoned basis for the agency's action that the agency itself has not given, we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974) (internal quotation marks, citations and ellipses omitted).  Further, citing *Gunderson v. United States Department of Labor*, 601 F.3d 1013, 1022 (10th Cir. 2010), in its 2013

*Memorandum Opinion and Order*, this Court pointed out that because scientific evidence

is at issue in this case:

> "This duty of explanation has added importance for cases in which medical
> or scientific evidence has been presented. A scientific dispute must be
> resolved on scientific grounds. This requires the ALJ to articulate a reason
> and provide support for favoring one opinion over another." *Id.* (internal
> quotation marks and citations omitted). The Court recognized that "courts
> generally afford [deference] to agency action that implicates scientific and
> technical judgments within the scope of agency expertise. . . . They have a
> corresponding obligation to use that skill when evaluating technical
> evidence." *Id.* (internal quotation marks, citations and emphasis omitted).
> Finally, the Court noted that "concomitant with the ALJ's duty to resolve
> all conflicts in the medical evidence is the responsibility to provide some
> general articulable basis for rejecting certain key medical evidence that
> favors or disfavors an award of benefits." *Id.* (internal quotation marks and
> citations omitted).

[Doc. 23, pp. 29-30]

### *Remedy for Failure to Comply with the Court's 2013 Memorandum Opinion and Order*

Where a party fails to comply with a court's order, the court may order that the act

be done. Fed. R. Civ. P. 70(a); *Analytical Eng'g,* 425 F.3d at 451. In its 2013

*Memorandum Opinion and Order*, the Court ordered OPM to articulate a particular

reason for denying benefits and, in some cases, allow limited foundational medical

evidence regarding whether the services were medically necessary. [Doc. 23, pp. 50-101]

It is clear that, to the extent OPM has not complied with this Court's Order, a second

remand for further reconsideration by OPM would be futile.[2] *C.f. Ragland v. Shalala,*

---

[2] In determining that it would be futile to again remand to OPM to meet its burden of
articulating the reason for its determination, the Court takes into account:  1) that, despite
the Court stating the standard and providing a roadmap to OPM by individually

992 F.2d 1056, 1060 (10th Cir. 1993) (holding, in reviewing denial of social security benefits, that the court considers factors including the agency's "patent failure to satisfy the burden of proof" and a "long delay" in deciding whether to remand or immediately award benefits). Thus, the Court finds that this is the circumstance discussed in *Weight Loss Healthcare Centers of America v. Office of Personnel Management*, 655 F.3d 1202, 1212 (10th Cir. 2011), in which it is appropriate for the Court to order the relief set forth in OPM's regulations, which is for the Court to "order . . . OPM to require the carrier to pay the amount of benefits in dispute." 5 C.F.R. § 890.107(c).

**Analysis of Compliance with the Court's Order**

### Benefits for Debra Glibowski

For ease of review and reference, and to aid OPM in identifying the claims for which benefits must be paid, the Court groups the claims in the same grouping as in the Court's prior *Sealed Memorandum Opinion and Order.* [Doc. 23]

1.     Without expressly addressing the services, OPM denied benefits for Dr. Ryser's initial examination of Ms. Glibowski on September 25, 2006. [Doc. 46-1, pp. 3-6; Doc. 23, pp. 45-46] OPM's 2013 Final Decision denied benefits for these claims, and the Court remanded this determination to OPM to "articulate its reasons for denying benefits for these services." [Doc. 23, p. 50] OPM's 2015 Final Decision does not expressly address these claims. [Doc. 46-1, pp. 3-6] By failing to address the claims, the Court

addressing groups of claims, OPM nonetheless failed to explicitly address several claims; 2) OPM's repeated representations that it is understaffed and "dealing with a high volume of cases," which suggest that further remand would result in additional unjust delay; and 3) that this case has been on appeal to either OPM or to this Court since 2009. [Doc. 41-1, p. 1 ¶ 2; Doc. 41-2]

determines that OPM failed to "supply a reasoned basis for the agency's action," as required by the Court. *Bowman Transp., Inc.*, 419 U.S. at 285-86. Accordingly, the Court orders "OPM to require the carrier to pay the amount of benefits in dispute." 5 C.F.R. § 890.107(c).

2, 3, 4. OPM denied benefits for several medical tests conducted on September 26, 2006. [Doc. 46-1, pp. 3-6; Doc. 23, pp. 51-58] As an initial matter OPM makes no attempt to individually explain the basis for its reason for denying benefits for most tests [Doc. 46-1, pp. 3-6], which would have been particularly helpful for purposes of review, and which was what the Court ordered. [Doc. 23, p. 51] Instead of explaining its basis for *denying* benefits for some tests, OPM explains its reasons for *paying* benefits for other tests, including a comprehensive metabolic panel, complete blood count, and a thyroid panel. [Doc. 46-1, pp. 4-5] However, this backwards approach is not useful on appeal because the question before the Court is whether OPM met its burden of articulating a reason for *denying* disputed benefits. *See Weight Loss Healthcare Ctrs.*, 655 F.3d at 1212 (determining that it is insufficient for OPM to "make a finding necessary to its decision . . . without any supporting evidence or even an explanation of why evidence was unnecessary.").

   To the extent it does address the medical tests, OPM discusses them globally and by solely quoting the medical reviewer, who states: "In my opinion, very few of the tests (and none of the tests for 'chronic Lyme disease') appear to have been clinically indicated." [Doc. 46-1, pp. 3-4] OPM does not identify which tests are for "chronic Lyme disease." [Doc. 46-1, p. 3] Further, while OPM indicates that certain *repeat* tests

were not medically necessary [Doc. 46-1, pp. 4-5], OPM gives no explanation as to why any of the tests conducted on September 26, 2006 (which were the first time the tests were run) were not medically necessary.  [Doc. 46-1, pp. 4-5]

The Court previously remanded the denial of benefits for the September 26, 2006 medical tests to OPM to "articulate a particular reason for denying benefits for these services" and to develop evidence, if necessary, on "whether the services were consistent with standards of good medical practice in the United States, in accordance with *Weight Loss Healthcare Centers*, 655 F.3d at 1211-12 and *Gunderson*, 601 F.3d at 1022." [Doc. 23, pp. 51-56]  OPM failed to comply with the Court's Order by failing to articulate any basis for denial of benefits for these tests.  Thus, the Court orders "OPM to require the carrier to pay the amount of benefits in dispute."  5 C.F.R. § 890.107(c).

5.      On September 27, 2006, Mrs. Glibowski again had a medical visit with Dr. Ryser, and again OPM gives no explanation for denying benefits for these services.  [Doc. 46-1, pp. 3-6; Doc. 23, p. 58]  OPM has not complied with the Court's order to explain the reason for its decision, and thus, the Court orders "OPM to require the carrier to pay the amount of benefits in dispute."  5 C.F.R. § 890.107(c).

6, 16, 17.   Dr. Ryser administered treatment to Ms. Glibowski for Lyme disease, secondary hypercoagulable state, disease of central nervous system, and dehydration on September 28, 2006, April 16, 2007 and October 4, 2007.  [AR 1140, 1290, 1291-1311] OPM denied benefits for these services.  [Doc. 46-1, p. 4; Doc. 23, pp. 58, 71-72]

There is a debate in the medical community concerning whether "chronic" Lyme disease exists, and, in either event, whether antibiotic treatment for Lyme disease for

longer than 28 days is therapeutic.   Regarding this debate, in its 2015 Final Decision,

OPM states the following:

> The concept of chronic Lyme disease has been extensively investigated and confuted.  For a number of reasons, the provider's plan to treat with IV antibiotics contravenes the preponderance of scientific data and falls outside the current standard of common accepted practice.  There is no evidence that this patient has a condition for which IV antibiotics are indicated.  According to generally accepted, evidence-based, up-to-date guidelines published by the Infectious Diseases Society of America (IDSA), indications for parenteral antibiotics for patients with Lyme disease include meningitis or radiculopathy, atrioventricular heart block and/or myopericarditis, and may be considered for arthritis. [1]  Based upon the information provided, the patient does not appear to have any of these conditions.  Moreover, there is not sufficient scientific data to support the use of antibiotics beyond twenty-eight days, nor is there scientific data to support the continuation of antibiotics until the resolution of symptoms. This injudicious use of antibiotics is unlikely to provide any real therapeutic benefit, unnecessarily exposes the patient to the risks associated with prolonged intravenous access and prolonged exposure to antibiotics, and contributes to the emergence of antibiotic resistant organisms.
>
> Although Dr. Ryser and other "Lyme literate" physicians are critical of the IDSA guidelines, it is worth noting that the guidelines for the diagnosis and treatment of patients with Lyme disease have been scrutinized by members of an independent medical review panel and found to be "medically and scientifically justified" with no changes recommended. [1]  Despite claims by some providers such as Dr. Ryser that chronic Lyme disease is a legitimate diagnosis, there is no convincing evidence for the persistence of B. burgdorferi (Borrelia) infection among immune competent patients treated for Lyme disease and antibiotics have not proven useful for patients with chronic (>/= 6 months [greater than or equal to six]) symptoms. [2,3] Although there are several recent studies that suggest that B. burgdorferi may persist in nonhuman animals after antibiotic therapy, these bacteria were usually non-cultivatable and it is not clear whether they were infectious. [4,5] Per the National Institute of Allergy and Infectious Disease "The implications of these findings to persistent infection and the nature of (Post Treatment Lyme Disease Syndrome) in humans are yet to be fully understood". [6] Moreover, four National Institutes of Health-sponsored antibiotic treatment trials of patients with persistent unexplained symptoms despite previous antibiotic treatment of Lyme

disease, determined that retreatment provides little if any benefit and carries significant risk.

[Doc. 46-1, p. 4]

First, the Court notes that the studies cited by OPM were not included in the record,[3] despite the Court's statement in its 2013 *Memorandum Opinion and Order* that the absence from the record of the articles on which the independent physician relied

_____

[3]  As set forth by OPM, the documents cited in the footnotes embedded within the text above include:

> 1.  The Clinical Assessment, Treatment, and Prevention of Lyme Disease, Human Granulocytic Anaplasmosis, and Babesiosis: Clinical Practice Guidelines by the Infectious Diseases Society of America. Gary P. Wormser, Raymond J. Dattwyler et al. Clin Infect Dis. (2006) 43 (9): 1089-1134. doi:10.1086/508667
>
> 2.  Treatment trials for post-Lyme disease symptoms revisited. Klempner MS, Baker PJ, Shapiro ED, Marques A, Dattwyler RJ, Halperin JJ, Wormser GP. Am J Med. 2013 Aug; 126(8):665-9 doi:10.1016/j.amjmed.2013.02.014. Epub 2013 Jun 10.
>
> 3.  Expert Review of Anti-Infective Therapy. Informa Healthcare. Mary Yianni 2013 Impact Factor: 3.063.2011.  ISSN: 1478-7210 (print), 1744-8336 (electronic). 2011 Jul; 9(7):787-97. doi: 10.1586/eri.l1.63.
>
> 4.  Spirochete antigens persist near cartilage after murine Lyme borreliosis therapy. Bockenstedt LK, Gonzalez DG, Haberman AM, Belperron AA. J Clin Invest 122(7):2652-60, 2012.
>
> 5.  PLOS One, Persistence of Borrelia burgdorferi in Rhesus Macaques following Antibiotic Treatment of Disseminated Infection. Stephen W. Barthold, Juan T. Borda, Lisa Bowers, Lara Doyle, Emir Hodzic et al. Published: January 11, 2012. DOI: 10.1371/journal.pone.0029914
>
> 6.  National Institute of Allergy and Infectious Disease. Lyme Disease. Updated 12/16/14 (no author listed). http://www.niaid.nih.gov/topics/ lymeDisease/research/Pages/antibiotic.aspx

The Court was able to obtain all of these cited documents except citation number 3.  Despite OPM's failure to include the proper citation or the article in the record, OPM also cites another source, citation 2, which is readily obtainable, for the same proposition.  The Court will only consider the readily available sources as evidence supporting OPM's conclusion.  Further, citation 6 is not a peer-reviewed article, which the Court considers with regard to the weight of OPM's conclusions.

resulted in the lack of evidence in the record "which explains why the tests ordered by Dr. Ryser, Dr. Ryser's clinical diagnosis, and the treatment ordered by Dr. Ryser were not consistent with good standards of medical practice."  [Doc. 23, p. 61]  Though OPM cited the medical articles in its 2015 Final Decision, it nonetheless still failed to include them in the record.  The inclusion of the actual studies in the record, rather than simply citing them, serves two purposes.  First, it assists the Court in obtaining and reviewing the necessary documents in order to determine whether the evidence supports OPM's decision.  *See, e.g., Colicchio v. OPM*, 2011 WL 382403, *6 (D. Md. 2011) (unpublished decision) (reviewing "other literature [medical articles] in the record" and determining that it supported OPM's decision).  Second, it makes a part of the record the evidence supporting the decision to the claimants, who may not have access, or affordable access, to such documents otherwise.

Despite OPM's failure to comply with this Court's Order by putting its evidence in the record, the Court concludes that, in this case, the failure to include the cited references in the record does not require the Court to remand yet again for OPM to comply with the Court's directives.  The Court was able to obtain all but one of the cited documents by searching the internet without resort to a fee-based library catalog.  The Plaintiffs in this case, having submitted many internet-based documents themselves, are clearly capable of performing the simple internet research required to obtain these articles, and thus the Court cannot conclude that OPM's failure to include the articles in the record has prevented Plaintiffs from submitting their position and contrary evidence.

Accordingly, the Court will review the documents cited by OPM in determining whether OPM has explained the basis for the denial of benefits.

Unlike in its 2013 Final Decision, here OPM sufficiently explained the basis for the denial of antibiotic treatment for "chronic Lyme disease." In its 2015 Final Decision, OPM focuses on the lack of support for the treatment provided. [Doc. 46-1, p. 4] Citing the IDSA guidelines, OPM states that there is a lack of "evidence that this patient has a condition for which IV antibiotics are indicated," and even if Ms. Glibowski had Lyme disease:

> indications for parenteral antibiotics for patients with Lyme disease include meningitis or radiculopathy, atrioventricular heart block and/or myopericarditis, and may be considered for arthritis.[1] Based upon the information provided, the patient does not appear to have any of these conditions.

[Doc. 46-1, p. 4] The IDSA Guidelines cited by OPM state:

> There is no convincing biologic evidence for the existence of symptomatic chronic *B. burgdorferi* infection among patients after receipt of recommended treatment regimens for Lyme disease. Antibiotic therapy has not proven to be useful and is not recommended for patients with chronic (≥6 months) subjective symptoms after recommended treatment regimens for Lyme disease (E-I).
> **Therapeutic modalities not recommended.** Because of a lack of biologic plausibility, lack of efficacy, absence of supporting data, or the potential for harm to the patient, the following are *not* recommended for treatment of patients with any manifestation of Lyme disease: . . . long-term antibiotic therapy.

(Wormser et al., 2006, p. 1094) (emphasis added). The IDSA guidelines were peer-reviewed and developed from the review of 405 cited studies and articles. *Id.* Further, after the ILADS Guidelines (upon which Plaintiffs rely) were published, a panel reviewed the evidence from four National Institutes of Health sponsored antibiotic

treatment trials of patients with persistent Lyme disease related symptoms after previous antibiotic treatment.  (Klempner et al., 2013)  This panel concluded that there is a lack of evidence that prolonged antibiotic treatment is effective for patients with persistent symptoms after an initial course of treatment for Lyme disease.  *Id.* at p. 6.  This article also concluded, as did OPM, that the potentially life-threatening risks associated with prolonged intravenous antibiotic treatment weigh against the use of such treatment.  *Id.* at p. 3.

Given OPM's explanation, along with the peer-reviewed articles cited by OPM, the Court concludes that OPM adequately explained the basis for its decision.  OPM stated, and supported, the reason for concluding that the prolonged antibiotic treatment administered to Mrs. Glibowski was not consistent with standards of good medical practice, in that such treatment is not consistent (and in fact contrary to) generally accepted treatment standards.  [Doc. 46-1, p. 4]  Further, OPM explained, again citing support, that members of the medical community have considered the general theories relied on by Plaintiffs and have still determined that antibiotic treatment for greater than six months is not beneficial to Lyme disease patients.  [Doc. 46-1, p. 4]  Thus, OPM explained its basis for rejecting the scientific evidence proffered by Plaintiffs.  [Doc. 46-1, p. 4]  Applying the arbitrary and capricious standard of review, the Court defers to OPM's expertise in reaching its factual conclusions on the scientific evidence presented.  *See Weight Loss Healthcare Ctrs.*, 655 F.3d at 1207 (explaining the deferential standard required given "OPM's experience and expertise"); *Gunderson*, 601 F.3d at 1022 (courts generally grant deference to agency action, particularly where the agency must make

scientific or technical determinations).  Consistent with 5 U.S.C. § 557(C)(3)(A), OPM "articulate[d] a reason and provide[d] support for favoring one opinion over another." *Gunderson*, 601 F.3d at 1022.

The Court acknowledges that there are likely conditions for which there may be more than one treatment which are "consistent with standards of good medical practice in the United States."  [AR 2185]  Further, the Court recognizes that there remains an ongoing debate in both the medical community and in the public at large regarding the proper treatment for persistent symptoms associated with Lyme disease.  However, the Court is limited to deciding this case on the evidence before it and consistent with the standards established by Congress, OPM, and controlling case law.  The Court concludes that in this case OPM has articulated a rational and reasonable basis, supported by adequate scientific evidence, for determining that the long-term antibiotic treatment Dr. Ryser administered to Ms. Glibowski was not consistent with standards of good medical practice.  Under these circumstances, the Court must conclude that OPM complied with this Court's 2013 *Memorandum Opinion and Order* and uphold OPM's decision as not arbitrary and capricious.

7.    OPM denied benefits for testing for heavy metals on October 16, 2006.  [Doc. 46-1, pp. 3-6; Doc. 23, p. 62]  As stated above, OPM explains its reasons for paying benefits for certain tests.  OPM, quoting the medical reviewer, states:

> Among the multitude of laboratory studies and other tests ordered by Dr. Ryser, I consider only the following to be justified[:]
> - Comprehensive metabolic panel (CMP), initial (9/06) and complete blood count (CBC), initial (9/06).  Dr. Ryser's weekly repeat testing for both of these labs (CMP and CBC) would be considered to be far

16

too frequent.  Although both the CMP and CBC are appropriate during the initial visit and perhaps occasionally thereafter, I see no indication for weekly testing in this patient.  There is no prescribed frequency of ordering a CBC or CMP and providers may order these and similar labs more frequently if there are concerning abnormalities or anticipation of abnormalities (e.g. monitoring neutropenia in a patient receiving chemotherapy).  However, this patient's CBC and CMP results are consistently unremarkable, save for a persistent slightly elevated aspartate aminotransferase (AST) and alanine aminotransferase (ALT).  With respect to these elevated liver associated enzymes, testing for hepatitis virus and cytomegalovirus (CMV) on one occasion can be considered appropriate.  Diagnostic imaging, such as a right upper quadrant ultrasound, would also have been appropriate but does not appear to have been ordered.

- Thyroid panel (9/06).  This test was reasonable in this patient with complaints of chronic fatigue and malaise and need only be ordered once if the results are within normal limits.

- Antinuclear antibody (ANA) (9/20/07).   Although this test for autoimmune disorders (such as Systemic Lupus Erythematosus) should not be used for screening, it may be appropriate in this patient with chronic, multisystem complaints.  If negative, it need only be ordered once.

- Lipid panel (11/2/07).  This study would be generally appropriate as a matter of routine health screening and ordered yearly or twice yearly.  Note there seems to be a disconnect between the various tests for babesiosis including those conducted by several independent non-FDA (food and Drug Administration) approved laboratories with questionable reputations and practices (9/27/06) [footnotes omitted] such as a peripheral smear reportedly showing Babesia (5/4/07) and a subsequent repeatedly negative Babesia serology.  The reproduced image of the smear is too poor quality for me to concur or disagree with its interpretation.  However, I am skeptical of this finding as well as an indication for testing in this patient.  Babesiosis typically presents similar to malaria with fever, chills, hemolytic anemia and thrombocytopenia, none of which are evident in this patient.  Giving the provider the benefit of the doubt and assuming she wished to treat the patient for Babesiosis based on the questionable peripheral blood smear, 7 to 10 [] days of oral antibiotics, typically a combination of atovaquone and azithromycin, is arguably justified.

Note that during the period analyzed there were several tests ordered that may or may not have been indicated.  These include stool studies for ova

> and parasites and a morning cortisol test.  The stool study is appropriate in a patient with chronic diarrhea and the cortisol study in a patient with hypotension and fever.  I cannot find documentation of diarrhea, fever or hypotension in the provider's notes but again, they are mostly illegible.
> In summary, I support the insurer's denial of the majority of the claims[] (other than the few lab studies mentioned above).

[Doc. 46-1, pp. 4-5]

This explanation does not mention anything about metal testing.  The Court previously remanded the denial of benefits for these claims to OPM to articulate its rationale for denying benefits and to develop evidence, if necessary, to justify its decision.  [Doc. 23, p. 62]  OPM failed to comply with the Court's Order by failing to articulate any basis for denial of the testing for metals.  Thus, the Court orders "OPM to require the carrier to pay the amount of benefits in dispute." 5 C.F.R. § 890.107(c).

8.      OPM denied benefits for fifteen tests administered to Mrs. Glibowski on October 19, 2006.  [Doc. 46-1, pp. 3-6; Doc. 23, p. 62-63]  OPM's decision does not explicitly address the tests with the following CPT codes:  82492, 82656, 83520, 83986 or 84311.  [Doc. 46-1, pp. 3-6]  For the other 10 tests, they appear to be for various parasites, and thus appear to be addressed by the following statement by OPM (quoting the independent medical examiner):

> [T]here were several tests ordered that may or may not have been indicated.  These include stool studies for ova and parasites and a morning cortisol test.  The stool study is appropriate in a patient with chronic diarrhea and the cortisol study in a patient with hypotension and fever.  I cannot find documentation of diarrhea, fever, or hypotension in the provider's notes but again, they are mostly illegible.

[Doc. 46-1, p. 5]  While illegible records can cause an initial difficulty in determining the medical necessity of treatment or tests, OPM has both the ability and the burden to

18

request, with specificity, additional documentation when necessary to make a determination on medical necessity. *See* 5 C.F.R. § 890.105(e)(2)(iii) (stating that OPM may "[o]btain any other information as may in its judgment be required to make a determination"). The record does not indicate that OPM ever sought further clarification from either Plaintiffs or Dr. Ryser regarding illegible medical records. The Court concludes that it is inconsistent with OPM's burden to deny benefits without gathering further evidence when an independent medical reviewer refuses to make a determination regarding medical necessity due to illegible records. Furthermore, the Court notes that Mrs. Glibowski marked diarrhea on various symptom questionnaires before the tests were run. [Doc. 59-8, p. 100; Doc. 59-9, p. 22]

For the foregoing reasons, OPM failed to articulate a reason for denying benefits for some tests and failed to ensure sufficient evidence was in the record to justify denying benefits for the remaining tests. OPM thus failed to comply with the Court's 2013 Order and thus the Court orders "OPM to require the carrier to pay the amount of benefits in dispute." 5 C.F.R. § 890.107(c).

9.     OPM denied benefits for two tests performed by Genova Diagnostics on November 12, 2006. [Doc. 46-1, pp. 3-6; Doc. 23, p. 63] One was a "cortisol, free" test and one was for "dehydroepiandrosterone." [AR 1291] The independent medical reviewer did not make any determination on the cortisol study due to illegible medical records. [Doc. 46-1, p. 5] Again, OPM had the ability and duty to obtain clarification of illegible medical records but failed to do so. OPM's denial of benefits after failing to gather sufficient medical evidence is inconsistent with the Court's prior order. As for the

other test, OPM does not explicitly discuss it and therefore failed to articulate its reason for denying benefits for the test.  Accordingly, OPM failed to comply with the Court's 2013 Order and the Court orders "OPM to require the carrier to pay the amount of benefits in dispute."  5 C.F.R. § 890.107(c).

10.    OPM denied benefits for another two tests performed by Genova Diagnostics on November 15, 2006.  [Doc. 46-1, pp. 3-6; Doc. 23, p. 64]  These were the same two tests performed three days earlier on November 12, 2006.   [AR 1291]   Other than the statement that references to symptoms justifying tests for cortisol are illegible, there is no explanation regarding these tests.  [Doc. 46-1, p. 5]  Again, OPM failed to articulate a reason for denying benefits for these tests, and thus failed to comply with the Court's 2013 Order.  The Court orders "OPM to require the carrier to pay the amount of benefits in dispute."  5 C.F.R. § 890.107(c).

11.    OPM denied benefits for a doctor's visit with Dr. Ryser on December 21, 2006.  [Doc. 46-1, pp. 3-6; Doc. 23, p. 64]  This service is described as "Same descriptor as 9/26/2006," which, in turn, is described as "Office or other outpatient visit for the evaluation and management of an established patient, which requires at least two of three components; moderate to high severity."  [AR 1289, 1291]  OPM does not explain why such an office visit was not consistent with standards of good medical practice and thus failed to articulate a reason for denying benefits for this service.  [Doc. 46-1, pp. 3-6]  Accordingly, OPM failed to comply with the Court's 2013 Order and the Court orders "OPM to require the carrier to pay the amount of benefits in dispute."   5 C.F.R. § 890.107(c).

12.    OPM denied benefits for two tests performed by LabCorp on December 26, 2006:
1) a test for "NK cells, total count"; and 2) a "skin test, unlisted."  [Doc. 46-1, pp. 3-6;
Doc. 23, p. 65]  OPM does not address these tests and therefore failed to articulate a
reason for denying benefits for this service.  [Doc. 46-1, pp. 3-6]  Accordingly, OPM
failed to comply with the Court's 2013 Order and the Court orders "OPM to require the
carrier to pay the amount of benefits in dispute."  5 C.F.R. § 890.107(c).

13.    OPM denied benefits for tests performed by Quest Diagnostics from January 4,
2007 through October 3, 2007, as grouped together in number 13 in the Court's 2013
*Memorandum Opinion and Order.*  [Doc. 46-1, pp. 3-6; Doc. 23, pp. 66-68]  One test,
CPT Code 85025 was a complete CBC, and Mrs. Glibowski had a normal CBC in
September, 2006.   [Doc. 2386]   OPM concluded that frequent CBC tests were
unnecessary given that "this patient's CBC and CMP results are consistently
unremarkable." 'Doc. 46-1, p. 5]  Accordingly, the Court affirms OPM's denial of
benefits for the CBC.  OPM does not address the remaining tests and therefore failed to
articulate a reason for denying benefits for them.  [Doc. 46-1, pp. 3-6]  Accordingly,
OPM failed to comply with the Court's 2013 Order and the Court orders "OPM to require
the carrier to pay the amount of benefits in dispute" other than the CBC test.  5 C.F.R. §
890.107(c).

14.    OPM does not discuss any of the treatments administered by Doctor on Call and
grouped together in the Court's paragraph numbered 14 in the Court's 2013
*Memorandum Opinion and Order.*  [Doc. 46-1, pp. 3-6; Doc. 23, pp. 68-70]  By and large
these are injections with L-A Bicillin" by Doctor on Call from January through March of

2007.  [AR 1291-92]  OPM's records assign these injections the diagnosis code for Beta

Strep.  [AR 1140, 1291-92]  OPM does not address antibiotics for Beta Strep,[4] only for

Lyme disease.   [Doc. 46-1, p. 4]   Further, OPM does not address Ms. Glibowski's

purported vitamin B-12 deficiency or the vitamin B-12 injections.  [Doc. 46-1, pp. 3-6]

Accordingly, OPM failed to articulate a reason for denying benefits for these tests and

services and failed to comply with the Court's 2013 Order.   The Court orders Court

"OPM to require the carrier to pay the amount of benefits," 5 C.F.R. § 890.107(c), for all

treatments for the services and treatments administered by Doctor on Call to Ms.

Glibowski on January 9, 2007, January 12, 2007, January 16, 2007, January 19, 2007,

January 23, 2007, January 27, 2007, January 30, 2007, February 6, 2007, March 9, 2007,

March 19, 2007, and March 26, 2007.

---

[4]  The Court notes that a simple internet search returns results stating "Group B
streptococcus (strep) is a common bacterium often carried in your intestines or lower
genital tract. Group B strep is usually harmless in adults. . . . Group B strep can also
cause dangerous infections in adults with certain chronic medical conditions, such as
diabetes or liver disease. . . . If you're a healthy adult, there's nothing you need to do
about group B strep."  Mayo Clinic. (2016). Group B strep disease. Retrieved from
http://www.mayoclinic.org/diseases-conditions/group-b-strep/home/ovc-20200548.
However, the Court cannot 1) make any medical determinations without testimony or
evidence produced by a qualified medical expert, *Gunderson*, 601 F.3d at 1022 ("[A]
scientific dispute must be resolved on scientific grounds. This requires the ALJ to
articulate a reason and provide support for favoring one opinion over another." (internal
quotation marks and citation omitted)); consider evidence outside the record; nor 3)
articulate a reason that OPM did not articulate. *Bowen Transp. Inc.*, 419 U.S. at 285-86.
Even if, theoretically, 10 out of 10 doctors would state that a positive test for Beta Strep
does not justify a series of 11 injections of antibiotics, in this record zero doctor stated as
much, and one doctor, Dr. Ryser, stated otherwise.  OPM failed to address Dr. Ryser's
statement that the injections were necessary due to Beta Strep, and thus did not meet its
burden of articulating a basis for the denial of benefits.

15, 19, 20, 22, 24.    OPM denied benefits for Mrs. Glibowski's medical visits to Dr. Ryser on February 27, 2007, July 2, 2007, July 30, 2007, October 1, 2007, October 8, 2007 and November 19, 2007.  [Doc. 46-1, pp. 3-6; Doc. 23, pp. 70-76]  Again, OPM does not discuss these visits or state a reason for determining that the medical visits were not medically necessary.  [Doc. 46-1, pp. 3-6]  OPM failed to articulate a reason for denying benefits for these services and failed to comply with the Court's 2013 Order. The Court orders "OPM to require the carrier to pay the amount of benefits in dispute." 5 C.F.R. § 890.107(c).

21, 23, 25, 26, 27. OPM denied benefits for tests conducted from September 19, 2007 to December 4, 2007, as set out in the Court's 2013 *Memorandum Opinion and Order*, including a comprehensive metabolic panel (CMP), Amylase, Lipase, Sedimentation rate, Natural Killer cells and an unlisted antigen.  [Doc. 46-1, pp. 3-6; Doc. 23, pp. 75-78] OPM paid benefits for a CMP test administered October 8, 2007 but denied benefits for the remaining tests on September 19, 2007, October 8, 2007, November 2, 2007, November 19, 2007, and December 4, 2007.  [Doc. 46-1, pp. 3-6; Doc. 23, pp. 75-78]

     The only test which OPM expressly addresses in its 2015 Final Decision is the CMP, as discussed above.  [Doc. 46-1, pp. 4-5]  Because OPM articulated a basis for its decision with regard to the CMP on September 9, 2007, the Court affirms OPM's denial of benefits for the CMP test.  OPM did not articulate a reason for denying benefits for the remaining tests, and, accordingly OPM failed to comply with the Court's 2013 Order. The Court orders "OPM to require the carrier to pay the amount of benefits" for all tests in these groups other that the CMP on September 9, 2007.  5 C.F.R. § 890.107(c).

28.     OPM denied benefits for a test performed by Clifford Consulting on December 5, 2007, described as "Immunassay for analyte other than infectious agent antibody or infectious agent antigen, qualitative or semiquantitative; multiple." [Doc. 46-1, pp. 3-6; Doc. 23, p. 78; AR 1312]   OPM did not expressly address this test and thus did not articulate a reason for denying benefits for the test, and, as such, OPM failed to comply with the Court's 2013 Order.   The Court orders "OPM to require the carrier to pay the amount of benefits in dispute." 5 C.F.R. § 890.107(c).

29.     Finally, OPM denied benefits for medical equipment, a "deluxe lightweight wheelchair" from Allegro Medical on an unknown date.   [Doc. 46-1, pp. 3-6; Doc. 23, pp. 78-79]   As before, OPM failed to articulate a reason for denying benefits for the wheelchair.   Thus, OPM failed to comply with the Court's 2013 Order and the Court orders "OPM to require the carrier to pay the amount of benefits in dispute."  5 C.F.R. § 890.107(c).

### Benefits for Robert Glibowski

Again, for ease of review and for OPM's guidance in identifying claims for which benefits must be paid, the Court groups the claims in the same grouping as in the Court's 2013 *Sealed Memorandum Opinion and Order* [Doc. 23].

1.     OPM denied benefits for numerous tests for Mr. Glibowski administered to September 27, 2006.  [Doc. 46-1, pp. 7-8; Doc. 23, pp. 79-81]  Except as noted otherwise below, OPM does not explicitly address each test administered Mr. Glibowski.  As with its decision concerning tests administered to Mrs. Glibowski, OPM gave reasons for approving benefits for certain tests rather than reasons for denying benefits for disputed

tests.  OPM failed to meet its burden of explaining its rationale for concluding that the tests are not consistent with the standards of good medical practice and thus not medically necessary.  *See Bowman Transp., Inc*., 419 U.S. at 285; *Gunderson*, 601 F.3d at 1022-24; *Weight Loss Healthcare Ctrs.*, 655. F.3d at 1211-12.

Dr. Ryser stated that the tests administered on September 27, 2006 to Mr. Glibowski were medically necessary for two reasons:   1) that such infections are associated with Lyme disease [AR 1540]; and 2) that Mr. Glibowski "**had symptoms of**: Viral and/or bacterial infections, tick-born disease, candida, Virus Infections: CMV, HHV6, EBV, West Nile Virus, Cosachaii; Bacterial Infections: Chlamydia, H-Pylori, Mycoplasma, or Venereal (sic) Disease." [AR 1546]  OPM's 2015 Final Decision states: "In addition to what I consider to be a misguided approach to the diagnosis and management of the patient's Lyme disease, *the provider also seems to implicate pathogens in the diagnoses for which there is no proven association (e.g. EBV/HHV-6 and chronic fatigue syndrome.*"   [Doc. 46-1, p. 8 (emphasis added)]  This statement articulates OPM's reason for denying the tests in order to diagnose Lyme disease. However, it fails to address the second basis Dr. Ryser gave for the medical necessity of the tests, that Mr. Glibowski had symptoms of the infections.  OPM did not compare Mr. Glibowski's symptoms to the symptoms of the infections for which tests were run, nor did OPM provide evidence establishing when such tests are and are not medically necessary.  [Doc. 46-1, pp. 7-8]

OPM further stated:

25

[Dr. Ryser] seems not to discern the significance between the presence of IgG (immunoglobulin G) and IgM (immunoglobulin M) antibodies, indicating past and recent/current exposure to pathogens, respectively. For example, the presence of IgG antibodies to the parvovirus, H. pylori, HHV-6, CMV (cytomegalovirus), EBV, chlamydia pneumonia, anaplasma, ehrlichia, and bartonella infection in this patient might indicate prior exposure to these pathogens, but is by no means diagnostic of current active disease. Nonetheless, the provider seems to have used the presence of IgG to diagnose and prescribe treatment for several infections, including babesiosis, bartonellosis, and ehrlichiosis. . . .

Possible justification can be made for the one time testing of thyroid function (such as on 7/9/2007; CPT 84439 and 84481) in this patient with chronic fatigue and depression. A lipid panel can also be considered routine health care and it is reasonable to check this once, perhaps twice yearly, not monthly (6/6/2007; CPT 80061). *I agree with the insurer's denial of reimbursement for the majority of the multitude of lab tests.* I also agree with the denial of coverage for the intramuscular penicillin.

[Doc. 46-1, p. 8 (Emphasis added.)]

The Court assumes that it was not medically necessary to run the tests for past medical infection, IgG, alone. However, both IgG and IgM were all run in the same panel. [AR 1476] The Court also notes that one test for Epstein-Barr virus showed IgM positive results. [AR 1476] Without further explanation of why the IgM tests were inappropriate, OPM failed to articulate a basis for denying benefits for the tests administered to Mr. Glibowski on September 27, 2006.

Finally, OPM states that "a number of the labs," which labs are not specified, "to which [Dr. Ryser] routinely sends samples seem to be independent, non-FDA (Food and Drug Administration) approved and of questionable reputation, and some of the tests offered are expressly for research purposes only." [Doc. 46-1, p. 8] OPM does not identify the labs or the tests, and does not offer evidence, beyond its own conclusory

statement, that the certain labs are independent, non-FDA approved, or of questionable reputation.[5]   However, the test results for Medical Diagnostic Laboratories state that nearly half of the tests were "developed and [their] performance characteristics determined by Medical Diagnostic Laboratories, L.L.C.  [They] have not been cleared or approved by the U.S. Food and Drug Administration.  The FDA has determined that such clearance or approval is not necessary."  [AR 1477]  Nonetheless, the problem identified in the Court's 2013 *Memorandum Opinion and Order* still has not been addressed, that:

> Neither the decision of OPM nor the record offer any indication that FDA approval of such test is required, or that it cannot be lawfully marketed. Further, there is no evidence in the record establishing that "the consensus of opinion among experts regarding the drug, device, or biological product or medical treatment or procedure is that further studies or clinical trials are necessary to determine . . . its efficacy as compared with the standard means of treatment or diagnosis." [AR 2184]

[Doc. 23, p. 55-56]

"While [the court] may not supply a reasoned basis for the agency's action that the agency itself has not given, we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Bowman Transp., Inc.,* 419 U.S. at 285-86. OPM has failed to provide the court with the necessary evidence and analysis to uphold its decision, and thus, OPM failed to comply with the Court's 2013 *Memorandum*

---

[5] OPM does cite to an on-line message board called LymeNet Europe which states that there was a verdict against Bowen Research and in favor of a couple who was "falsely diagnosed with Lyme disease," [Doc. 46-1, p. 8, n. 8] and another web-site, which states it provides "Patient Advocacy and Education," which lists labs without providing evidence by which the Court could conclude that the labs are not FDA approved or of questionable reputation.  [Doc. 46-1, p. 8, n. 9]  Neither of these sources are medical or scientific evidence, which the Court remanded this case to OPM to put in the record, and they are not sufficient for this Court to uphold OPM's decision.  *Gunderson*, 601 F.3d at 1022.

*Opinion and Order.*  The Court therefore orders OPM to "require the carrier to pay the amount of benefits" for these tests.  5 C.F.R. § 890.107(c).

2.      In the Court's 2013 *Memorandum Opinion and Order*, the Court remanded to OPM to explain the basis for its denial of benefits for many of Mr. Glibowski's visits to Dr. Ryser "because Dr. Ryser's medical records did not support the CPT code billed. [AR 2032, 2035, 2037, 2038, 2040, 2041, 2044, 2045-46]"  [Doc. 23, pp. 81-82]  OPM's 2015 Final Decision does not address these visits by Mr. Glibowski to Dr. Ryser.  [Doc. 46-1, pp. 7-8]  OPM failed to reconsider these claims and issue a decision explaining its reason for denying benefits for the same, and thus OPM failed to comply with the Court's 2013 *Memorandum Opinion and Order*.  The Court therefore orders OPM to "require the carrier to pay the amount of benefits" for these tests.  5 C.F.R. § 890.107(c).

3.      OPM denied benefits for tests performed by Immunosciences on September 27, 2006.  [Doc. 46-1, pp. 7-8; Doc. 23, pp. 82-84]  Again, OPM fails to specifically address these tests, and thus again, OPM failed to provide the court with the necessary evidence and analysis to uphold its decision.  Accordingly, OPM failed to comply with the Court's 2013 *Memorandum Opinion and Order*.  The Court orders OPM to "require the carrier to pay the amount of benefits" for these tests.  5 C.F.R. § 890.107(c).

4.      OPM denied benefits for a test performed by Oncolab, Inc. on September 28, 2006.  [Doc. 46-1, pp. 7-8, Doc. 23, pp. 85-86]  OPM does not specifically address this test, and failed to cure the deficiencies explained in the Court's 2013 *Memorandum Opinion and Order.*  [Doc. 23, pp. 85-86]  Thus, again, OPM failed to provide the court with the necessary evidence and analysis to uphold its decision.  The Court therefore

orders OPM to "require the carrier to pay the amount of benefits" for this test.  5 C.F.R. §

890.107(c).

5.      OPM denied benefits for seven tests for metals and arsenic on October 16, 2006,

by Doctors Data.  [Doc. 46-1, p. 8; Doc. 23, pp. 86-87]   OPM does not specifically

address these tests and failed to cure the deficiencies explained in the Court's 2013

*Memorandum Opinion and Order.*  [Doc. 23, pp. 86-87]   Thus, again, OPM failed to

provide the court with the necessary evidence and analysis to uphold its decision.  The

Court orders OPM to "require the carrier to pay the amount of benefits" for these tests.  5

C.F.R. § 890.107(c).

6.      OPM denied benefits for treatments by Doctor on Call on January 16, 2007,

January 23, 2007, and February 6, 2007.  [Doc. 46-1, pp. 7-8; Doc. 23, pp. 87-90]   At

these visits Mr. Glibowski received intra-muscular injections of penicillin and other

drugs.  [AR 2035-36]  OPM's records assign these injections the diagnosis code for Beta

Strep.  [AR 1140, 1291-92]  As with its decision regarding Mrs. Glibowski, OPM does

not address antibiotics for Beta Strep, only for Lyme disease.   [Doc. 46-1, p. 4]

Accordingly, OPM failed to articulate a reason for denying benefits for these services and

failed to comply with the Court's 2013 Order.  The Court orders Court "OPM to require

the carrier to pay the amount of benefits," 5 C.F.R. § 890.107(c).

7.      OPM denied benefits for multiple tests grouped at number 7 in the Court's 2013

*Memorandum Opinion and Order* [Doc. 46-1, pp. 7-8; Doc. 23, pp. 90-95]  OPM paid

benefits for the lipid panel but did not address the remainder of the tests administered this

date in OPM's 2015 Final Decision.  [Doc. 46-1, pp. 7-8]  Accordingly, OPM failed to

cure the deficiencies explained in the Court's 2013 *Memorandum Opinion and Order.* [Doc. 23, pp. 90-95]  OPM failed to provide the court with the necessary evidence and analysis to uphold its decision.  The Court therefore orders OPM to "require the carrier to pay the amount of benefits" for these tests.  5 C.F.R. § 890.107(c).

8.     OPM denied benefits for several tests grouped together at number 8 in the Court's 2013 *Memorandum Decision and Order.*  [Doc. 46-1, pp. 7-8; Doc. 23, pp. 95-96]  OPM paid benefits for a thyroid test on July 9, 2007 but OPM does not specifically address any of the other tests in its 2015 Final Decision.  [Doc. 46-1, pp. 7-8]  Thus, again, OPM failed to provide the court with the necessary evidence and analysis to uphold its decision and failed to cure the deficiencies explained in the Court's 2013 *Memorandum Opinion and Order.*  The Court therefore orders OPM to "require the carrier to pay the amount of benefits" for these tests.  5 C.F.R. § 890.107(c).

9.     OPM denied benefits for tests performed by Labcorp on July 16, 2007 for an unlisted antigen and for a Natural Kill cell total count test [AR 2039].  [Doc. 46-1, pp. 7-8; Doc. 23, pp. 96-98]  Again, OPM does not specifically address these tests in its 2015 Final Decision.  While OPM states "very few of the tests (and none of the tests for 'chronic Lyme disease') appear to have been clinically indicated," [Doc. 46-1, p. 7] OPM does not identify which tests were for chronic Lyme disease.  The Court is unable to determine if any of these tests were for Lyme disease.  Thus, the path to OPM's decision has not been provided.  *See Bowman Transp., Inc.,* 419 U.S. at 285-86 ("While we may not supply a reasoned basis for the agency's action that the agency itself has not given, we will uphold a decision of less than ideal clarity if the agency's path may reasonably be

discerned." (Internal citations omitted)).   Thus, again, OPM failed to provide the court with the necessary evidence and analysis to uphold its decision and failed to cure the deficiencies explained in the Court's 2013 *Memorandum Opinion and Order*.  The Court therefore orders OPM to "require the carrier to pay the amount of benefits" for these tests.  5 C.F.R. § 890.107(c).

10.   OPM denied benefits for tests performed by Quest Diagnostics on September 4, 2007.  [Doc. 46-1, pp. 7-8; Doc. 23, pp. 98-99]  OPM does not specifically address any of these tests in its 2015 Final Decision.[6]  Thus, again, OPM failed to provide the court with the necessary evidence and analysis to uphold its decision and failed to comply with the Court's 2013 Order.  The Court therefore orders OPM to "require the carrier to pay the amount of benefits" for these tests.  5 C.F.R. § 890.107(c).

11.  OPM denied benefits for tests performed by Quest Diagnostics on October 30, 2007. [Doc. 46-1, pp. 7-8; Doc. 23, pp. 99-101]  Other than paying benefits for a lipid panel test conducted this date, OPM does not specifically address any of the tests administered this date in its 2015 Final Decision.  Thus, again, OPM failed to provide the Court with the necessary evidence and analysis to uphold its decision and failed to comply with the Court's 2013 Order.  The Court therefore orders OPM to "require the carrier to pay the amount of benefits" for these tests.  5 C.F.R. § 890.107(c).

**CONCLUSION**

_____

[6] While OPM states that "justification can be made for the one time testing of thyroid function," OPM fails to explain why such testing should have only been done one time (as compared, for example, to OPM's explanation regarding why CMP and CBC testing was not repeatedly justified for Mrs. Glibowski).

**WHEREFORE,** for the foregoing reasons, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** Plaintiffs' *Motion to Enforce the Court's December 9, 2013 Order.* [Doc. 45]   Further the Court **grants** Plaintiffs' *Motion to Provide Notice/Modify Pleadings* [Doc. 56] and Defendant's *Opposed Motion for Enlargement of Time to File Sur Reply* [Doc. 53].

The Court hereby **REMANDS** this matter to OPM to "require the carrier to pay the amount of benefits," 5 C.F.R. § 890.107(c), for the tests and services identified above and to take all further action consistent with this Opinion.

**SO ORDERED** this 20th day of September, 2016 in Albuquerque, New Mexico.


_____
M. CHRISTINA ARMIJO
Chief United States District Judge

32